**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

**CASE NO. 15-CV-01297-BJD-MCR**

----------------------------------------------------x
**In the Matter of the Complaint**    :
    :
    **Of**    :
    :
**Sea Star Lines, LLC, d/b/a TOTE**    :
**Maritime Puerto Rico, as Owners; and**    :
**TOTE Services, Inc., as Owner pro hac**    :    **ANSWER, AFFIRMATIVE DEFENSES,**
**vice of the S.S. EL FARO for**    :    **And CLAIM of Claudia Aparecida**
**Exoneration from or Limitation of**    :    **Shultz, as Personal Representative of the**
**Liability**    :    **Estate of Steven Wink Shultz, deceased;**
    :
    :
    :
    :
    :
    :
    :
    :
    :
    :

## ANSWER TO VERIFIED COMPLAINT

1. Claimant, Claudia Aparecida Shultz, Individually and as Personal Representative of the Estate of Steven Wink Shultz, deceased, and on behalf of his children and heirs, files this Answer, Affirmative Defenses and Claims in response to Petitioner's Complaint for Exoneration from or Limitation of Liability as follows:

1. Admitted.

2. Admitted.

3. Claimant lacks sufficient knowledge and information to respond, therefore Denied.

4. Claimant lacks sufficient knowledge and information to respond, therefore Denied

5.      Denied

6.      Admitted.

7.      Admitted

8.      Denied.

9.      Admits that during the voyage from Jacksonville to San Juan, the S.S. El Faro, encountered Hurricane Joaquin, that on October 1st her master, reported a list and loss of propulsion, followed by other emergency messages which were received by the US Coast Guard, that despite search and rescue efforts, no further contact was made with the master or any crewmember of the El Faro. Claimant lacks sufficient knowledge and information to respond to the remaining allegations and same are therefore Denied

10.     Denied.

11.     Denied.

12.     Denied.

13.     Claimant lacks sufficient knowledge and information to respond, therefore Denied

14.     Claimant lacks sufficient knowledge and information to respond, therefore Denied

15.     Admitted

16.     Admit that in paragraph 16 of the Complaint Plaintiffs claim exoneration from liability for all losses or damages, and for all claims for damages that have or may be made. Denies Plaintiffs have any valid defenses which would entitle them to exoneration from liability. All remaining allegations of this paragraph are  Denied.

17.     Admit that in paragraph 17 of the Complaint Plaintiffs claim the benefits of limitation of liability provided by 46 U.S.C. 30505-30511 and the various statutes supplementary thereto and amendatory thereof. Denies knowledge or information as to the truth or veracity of the remaining allegations and therefore same are Denied.

18.     Admits that in paragraph 18 of the Complaint Plaintiffs claim the benefit of an injunction under Rule F (3) of the Supplemental Rules for Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.  Denies Plaintiffs are entitled to the benefits of an injunction or any other relief or benefit under Rule F (3) and refers all such determinations to the Court.

19.     Plaintiffs Prayer for Relief, paragraphs (a), (b), (c), (d) and (e).  Plaintiffs are not entitled to any relief as specifically requested or for any other relief not requested, therefor all allegations and prayers for relief are Denied.

## AFFIRMATIVE DEFENSES

1.     The Complaint fails to state a claim upon which relief can be granted.

2.     Plaintiffs are not entitled to either exoneration from or limitation of liability pursuant to 46 U.S.C. §§ 30501, et seq., for any and all loss, damage, and/or injury, and death caused by the loss of the El Faro on the high seas, because the El Faro was

not tight, staunch, strong, properly equipped, supplied, outfitted or under the command of a competent master, she was not seaworthy, fit, or suitable to undertake the service in which she was engaged and the voyage in question.  El Faro was Unseaworthy prior and during the subject voyage in multiple respects and was at all relevant times prior and during the subject voyage operated, managed and controlled by Plaintiffs negligently, willfully, wantonly, recklessly and in violation of applicable law and regulation; and all damages, injuries and losses resulting from the incident were caused or contributed to by the fault, design, neglect, negligence,  want of due care, and willful, wanton, reckless conduct of Plaintiffs  and/or their agents and/or employees and/or servants and/or apparent agents.

3.     The amount of security posted by the Plaintiffs or on their behalf in this limitation proceeding is neither sufficient nor adequate to properly discharge Petitioners' liabilities and obligations, nor does it reflect the correct values required by law.  This Court should, therefore, strike the Complaint, or failing that, order Plaintiffs to submit their interests in the Vessel and other property for re-evalutation and thereafter direct that Plaintiffs file security in an increased amount to cover the claims herein.The amount of security sought in the Complaint is insufficient and must be increased because, inter alia, such amount does not adequately reflect the value of the vessel together with pending freight.

**Claim of Claudia Aparecida Shultz, Individually, as Surving Spouse, and as Personal Representative of the Estate of Steven Wink Shultz, deceased, his children and all heirs.**

## JURISDICTION AND PARTIES

1.   Claimant "Claudia Aparecida Shultz" ("Claudia") is the lawful widow of Steven Wink Shultz, ("Steven Shultz" or at times "Steven"), the deceased. At all relevant times, Claudia and Steven were husband and wife residing in Lee County, Florida.

2.   At all relevant times Steven Shultz was a seaman and crewmember of the vessel El Faro, and for her last voyage, which ended in his death and the loss of the vessel, he was the Chief Officer.

3.   On November 10th, 2015, pursuant to the laws of Florida, Claudia was appointed by a judge of the Circuit Court for Lee County as Personal Representative of Steven's estate with full powers to administer the estate according to law. Attached as **Exh 1** is a certified copy of the Letters of Administration.

4.   This claim is brought by Claudia, individually, as surviving spouse, and as personal representative of the estate of Steven Wink Shultz and on behalf of his children and all heirs.

5.   Defendant SEA STAR Line, LLC d/b/a TOTE MARITIME PUERTO RICO  ("SEA STAR") is a Foreign Limited Liability Company organized under the laws and jurisdiction

of Delaware. SEA STAR at all relevant times was the registered, titled and documented owner of the EL FARO.

6. Defendant TOTE SERVICES INC. ("TOTE SERVICES") is a Foreign Corporation incorporated under the jurisdiction and laws of Delaware.

7. SEA STAR and TOTE SERVICES at times are referred to collectively as Plaintiffs.

8. MICHAEL DAVIDSON was a United States citizen and a resident of the State of Maine and during the last voyage of the EL FARO, was her master.

9. The matter in controversy exceeds, exclusive of interest, attorneys fees and costs, the sum of seventy-five thousand dollars, specified by 28 U.S.C. § 1332, and thus, in the event that Petitioners claim of exoneration and limitation of liability is defeated, is brought pursuant to this Court's diversity jurisdiction, and a jury trial is demanded.

10. In the event diversity jurisdiction does not apply, this court has subject matter jurisdiction as this matter falls under the Article III admiralty and maritime jurisdiction of this Court pursuant to 28 U.S.C. § 1333.

11. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2).

12. The causes of action asserted in this Complaint arise under the Jones Act, 46 U.S.C. § 30104; the Doctrine of Unseaworthiness under the General Maritime Law of the United

States; the Death on the High Seas Act, 46 U.S.C.§ 30301 et seq., and any other applicable wrongful death or survival act.

**GENERAL ALLEGATIONS COMMON TO ALL COUNTS**

13. At all relevant times Plaintiffs or any one of them operated or managed, or controlled or chartered the vessel El Faro.

14. At all relevant times Plaintiffs or any of them was the titled owner, or registered owner or legal owner or beneficial owner or owner *"pro hac vice"* of the vessel El Faro.

15. At all relevant times Plaintiffs or any one of them employed the seamen who manned the El Faro.

16. The "El Faro," was a cargo vessel identified by the IMO number 7395351 and official number 561732, call sign, WFJK, and at all relevant times, was transporting cargo between ports of the United States; specifically, to and from Jacksonville, Florida and San Juan, Puerto Rico.

17. The El Faro was built and launched at Sun Shipbuilding & DryDock Corporation in Chester PA. in 1975 as a Roll-On Roll Off Cargo Ship.  Her name at date of launching was PUERTO RICO. She was initially operated for approximately 15 years  in the U.S. East Coast trade by the Navieras de Puerto Rico Steamship Company.

18. Circa 1991, the vessel was purchased by Saltchuk Resources a parent company of TOTE Maritime, and renamed NORTHERN LIGHTS.

19. Circa 1993 while under the operation, management and control of Saltchuk Resources and or Plaintiffs, the vessel was lengthened by 90 feet at Alabama Shipyard, Inc.  Thereafter, the vessel sailed with regularity between Tacoma, Washington, and Anchorage, Alaska.

20. El Faro's  particulars at the time of her last voyage, were as follows:  31,515 Gross Tons, 21,473 Net Tons, 14,971 Dead weight tons, length 736.8 ft., breath 92.0 ft.

21. At all relevant times prior and during her last voyage, the El Faro has been a part of a fleet of vessels operated, managed and controlled by Plaintiffs serving a Jones Act trade route between the U.S. and Puerto Rico and the Caribbean.

**The Last Voyage of the El Faro**

22. On Monday, September 28th at 11:00 pm, 2015, the NHC (NHC) issued **Advisory #5** concerning Tropical Storm Joaquin, stating it was moving southwest with sustained speeds of 40 mph and in other particulars the following:

**Discussion and Outlook**
At 1100 PM EDT (0300 UTC), the center of Tropical Storm Joaquin was located near latitude 26.7 North, longitude 70.4 West. Joaquin is moving toward the southwest near 5 mph (7 km/h). A slow westward motion is expected during the next couple of days.

Maximum sustained have increased to near 40 mph (65 km/h) with higher gusts. Slow strengthening is forecast during the next 48 hours.
Tropical-storm-force winds extend southeastward up to 105 miles (165 km) from the center. The estimated minimum central pressure is 1002 mb (29.59 inches).

23. On Tuesday, September 29th at 5:00 am the NHC issued **Advisory #6** concerning Tropical Storm Joaquin stating in part the following:

8

**DISCUSSION AND 48-HOUR OUTLOOK**
At 5:00 AM EDT (0900 UTC), the center of Tropical Storm Joaquin was
located near latitude 26.6 North, longitude 70.6 West. Joaquin is
moving toward the west near 5 mph (7 km/h), and this general
motion is expected to continue through Wednesday. A decrease in
forward speed and a turn toward the west-northwest are forecast by
Wednesday night.

Maximum sustained winds are near 40 mph (65 km/h) with higher gusts.
Slow strengthening is forecast during the next 48 hours.

Tropical storm force winds extend outward up to 70 miles (110 km)
from the center.  The estimated minimum central pressure is 1002 mb (29.59 inches).

24. On Tuesday, September 29th,  at 11:00 am the NHC issued **Advisory** #7 stating in part the

following:

| | |
|---|---|
| **DISCUSSION AND 48-HOUR OUTLOOK** <br><br> At 1100 AM EDT (1500 UTC), the center of Tropical Storm Joaquin was <br>     located near latitude 26.5 North, longitude 70.8 West.  Joaquin is <br>     moving toward the west near 5 mph (7 km/h), and this general motion <br>     is expected to continue for the next 48 hours. <br><br>     Maximum sustained winds have increased to near 45 mph (75 km/h) <br>     with higher gusts.  Some strengthening is forecast during the next <br>     48 hours. <br><br>     Tropical storm force winds extend outward up to 70 The <br> estimated minimum central pressure is 1001 mb (29.56 inches). miles <br> (110 km)  from the center. | 9 Hours Prior to Departure of the El Faro |

25. On Tuesday, September 29th, at 5:00 pm the NHC issued **Advisory #8** stating that

"Joaquin could become a hurricane on Wednesday", that "maximum sustained winds had

increased to near 65 mph" and other particulars as follows::

| | |
|---|---|
| **DISCUSSION AND 48-HOUR OUTLOOK**<br>At 5;00 PM EDT (2100 UTC), the center of Tropical Storm Joaquin was<br>located near latitude 26.0 North, longitude 71.0 West. Joaquin is moving toward the west-southwest near 5 mph (7 km/h) and this general motion is expected to continue for the next couple of days.<br><br>Reports from an Air Force Hurricane Hunter aircraft indicate that the maximum sustained winds have increased to near 65 mph (100 km/h)<br>with higher gusts.  Additional strengthening is forecast during the next 48 hours, and Joaquin could become a hurricane on Wednesday.<br><br>Tropical storm force winds extend outward up to 90 miles (150 km)<br>from the center.<br><br>The Hurricane Hunter plane reported a minimum central pressure of<br>990 mb (29.24 inches). | 3 hours prior to the departure of the El Faro from Jacksonville |

26. **Exh 2** is a Three Day Graphic Cone Warning for Advisory **#8.**

**El Faro Departs Jacksonville**

27. At no time prior to departure did Plaintiffs "Designated Person" (ISM Code, Art.4) or any person in upper management discuss NHC Advisory #8  in regard to the risks presented to the vessel and her crew.

28. On Tuesday, September 29, at about 8 pm., more than 3 hours following **Advisory #8,**  El Faro departed the port of Jacksonville, Florida bound for San Juan, P.R.

29. Aboard El Faro at departure were approximately 391 containers topside and 294 cars, trucks and trailers below deck. Trucks and trailers are inherently difficult to properly

10

secure due to their high center of gravity.  Given the high likelihood of weather induced heavy rolling during the intended voyage, failure of truck and trailer lashings was virtually assured with a predictable outcome of destruction of the ship's structure at sea due to adrift rolling stock cargo.

30. On Tuesday, September 29th, at 11:00 pm the NHC issued **Advisory #9** stating that "Joaquin is forecast to become a hurricane later tonight or Wednesday" with "maximum sustained winds increased to 70 mph" and in other particulars as follows:

| DISCUSSION AND 48-HOUR OUTLOOK | 3 hours after the sailing of the El Faro from Jacksonville. On information and belief, the distance of the ship from the perimeter of the storm was about 470 miles. |
|---|---|
| At 1100 PM EDT (0300 UTC), the center of Tropical Storm Joaquin was located near latitude 25.8 North, longitude 71.7 West. Joaquin is moving toward the west-southwest near 5 mph (7 km/h) and this general motion is expected to continue for the next couple of days. On the forecast track, the center of Joaquin is expected to move near or over portions of the central Bahamas Wednesday night or Thursday. Maximum sustained winds have increased to near 70 mph (110 km/h) with higher gusts.  Additional strengthening is expected during the next 48 hours, and Joaquin is forecast to become a hurricane later tonight or Wednesday. Tropical-storm-force winds extend outward up to 125 miles (205 km), mainly to the east of the center. The estimated minimum central pressure is 988 mb (29.18 inches). | |

|  |  |
|--|--|
|  |  |

**31. Exh 3** is a Three Day Graphic Cone Warning for Advisory **#9.**

**32.** At no time following its publication did the "Designated Person" or any person in upper management contact El Faro to discuss the NHC Advisory **#9** and the risks presented to the vessel and her crew.

33. On Wednesday September 30th, at 2:00 am the NHC issued  **Bulletin Advisory # 9A** stating "Joaquin expected to become a hurricane soon" and in other particulars as follows:

| BULLETIN<br>            TROPICAL STORM JOAQUIN INTERMEDIATE<br>ADVISORY NUMBER   9A<br>            NWS NHC MIAMI FL   AL112015<br>            200 AM EDT WED SEP 30 2015<br><br>            ...JOAQUIN EXPECTED TO BECOME A<br>HURRICANE SOON AS IT MOVES<br>            WEST-SOUTHWESTWARD...<br><br>                    *          *          *<br>            SUMMARY OF WATCHES AND WARNINGS IN<br>EFFECT:<br><br>     A Hurricane Watch is in effect for... * Central Bahamas | 6 hours after departure of the El Faro from Jacksonville. On information and belief,  the distance of the storm perimeter from the ship was about 310 miles. |

**34. Exh 4** is a Three Day Graphic Cone Warning for Advisory **#9A.**

**35.** At no time following its  publication did the "Designated Person" or any person in upper management contact El Faro to discuss the NHC Advisory **#9A** and the risks presented to the vessel and her crew.

36. On Wednesday September 30th, at 5:00 am the NHC issue **Bulletin Advisory # 10** providing a "Hurricane Warning for Central Bahamas" and in other particulars the following:

| | |
|---|---|
| BULLETIN<br>TROPICAL STORM JOAQUIN ADVISORY NUMBER 10...CORRECTED<br>NWS NHC MIAMI FL      AL112015<br>500 AM EDT WED SEP 30 2015<br><br>Corrected to show Hurricane Watch for the Northwestern Bahamas<br>excluding Andros Island.<br><br>...HURRICANE WARNING ISSUED FOR THE CENTRAL BAHAMAS...<br>...HURRICANE HUNTERS ON THEIR WAY TO INVESTIGATE JOAQUIN... | 9 hours after departure of the El Faro from Jacksonville.  On information and belief, the distance of the storm perimeter from the ship was 255 miles |

37. **Exh. 5** is a Three Day Graphic Cone Warning for Advisory **#10.**

38. At no time following its  publication did the "Designated Person" or any person in upper management contact El Faro to discuss the NHC Advisory **#10** and the risks presented to the vessel and her crew.

39. On Wednesday September 30th at approximately 6:16 a.m, the El Faro began deviating from its usual straight-line route (approximately 140 degrees) to San Juan, Puerto Rico, shifting closer to the Bahamas, but still headed towards the storm at or near full speed.

40. On Wednesday September 30th, at 8:00 a.m. the NHC issued **Bulletin Advisory # 10A**
confirming that Joaquin was now a Hurricane with maximum sustained winds of 75 mph
and in other particulars the following:

| | |
|---|---|
| BULLETIN<br>HURRICANE JOAQUIN INTERMEDIATE ADVISORY<br>NUMBER **10A**<br>NWS NHC MIAMI FL      AL112015<br>800 AM EDT WED SEP 30 2015<br><br>...JOAQUIN BECOMES A HURRICANE...<br><br>        SUMMARY OF 800 AM EDT...1200<br>UTC...INFORMATION<br><br>        LOCATION...24.9N 72.2W<br>        ABOUT 245 MI...395 KM ENE OF THE CENTRAL<br>BAHAMAS<br>        MAXIMUM SUSTAINED WINDS...75 MPH...120<br>KM/H<br>        PRESENT MOVEMENT...SW OR 235 DEGREES AT<br>6 MPH...9 KM/H<br>        MINIMUM CENTRAL PRESSURE...971 MB...28.67<br>INCHES<br><br><br>        SUMMARY OF WATCHES AND WARNINGS IN<br>EFFECT:<br><br>        A Hurricane Warning is in effect for...<br>        * Central Bahamas including Cat Island, the Exumas,<br>Long Island,<br>        Rum Cay, and San Salvador.<br><br>        A Hurricane Watch is in effect for...<br>        * Northwestern Bahamas including the Abacos, Berry<br>Islands, Bimini,<br>        Eleuthera, Grand Bahama Island, and New Providence,<br>but excluding<br>        Andros Island | 12 hours after<br>departure of the El<br>Faro from<br>Jacksonville.  On<br>information and<br>belief, the distance of<br>the ship from the<br>storm perimeter was<br>about 270 miles |

41.  **Exh 6** is a Three Day Graphic Cone Warning for Advisory **#10A**.


**42.** At no time following its  publication did the "Designated Person" or any person in upper management contact El Faro to discuss the NHC Advisory **#10A** and the risks presented to the vessel and her crew.


43. On Wednesday September 30th at approximately 10:00AM, and 2 hours after Joaquin has become a hurricane, DAVIDSON  sent a communication to SEA STAR and/or TOTE SERVICES indicating that he understood the weather conditions in his intended path, that he had a sound plan, that his crew was well prepared and briefed and that in his opinion weather conditions looked favorable.


44. On Wednesday September 30th at approximately 10:00AM,  the El Faro was still north of the Bahamas and hundreds of miles from the approaching storm, and DAVIDSON and TOTE and/or SEA STAR had at least two  safe alternatives, none of which were followed:

   a.  Slow down to assess the weather;

   b.  Change course to Florida or in any direction away from  hurricane Joaquin.


45. On Wednesday September 30th, at 11:00 am the NHC issued **Advisory # 11** stating in part the following:

| | |
|---|---|
| ...JOAQUIN STRENGTHENS SOME MORE AS IT MOVES SOUTHWESTWARD TOWARD THE CENTRAL BAHAMAS... with maximum sustained winds of 80mph. | 15 hours after departure of the El Faro from Jacksonville. On information and belief,  the distance of the ship from the storm perimeter is was about 190 miles |

| | |
|---|---|
| SUMMARY OF 1100 AM EDT...1500 UTC...INFORMATION<br>-----------------------------------------------<br>LOCATION...24.7N 72.6W<br>ABOUT 215 MI...345 KM ENE OF THE CENTRAL BAHAMAS<br>MAXIMUM SUSTAINED WINDS...80 MPH...130 KM/H<br>PRESENT MOVEMENT...SW OR 230 DEGREES AT 6 MPH...9 KM/H<br>MINIMUM CENTRAL PRESSURE...971 MB...28.68 INCHES | |

**46. Exh 7** is a Three Day Graphic Cone Warning for Advisory **#11.**

**47.** At no time following its publication did the "Designated Person" or any person in upper management contact El Faro to discuss the NHC Advisory **#11** and the risks presented to the vessel and her crew.

48. On Wednesday at approximately 1:12 pm on September 30, 2015, DAVIDSON sent a communication to SEA STAR and/or TOTE stating his intention to take a route which would bring him about 65 miles from the center of the hurricane.

49. On Wednesday September 30th, at 2:00 pm the NHC issued **Bulletin Advisory # 11A** stating that Hurricane Joaquin continued to strengthen with maximum sustained winds at 85 mph and in other particulars as follows:

| | |
|---|---|
| BULLETIN<br>HURRICANE JOAQUIN<br>INTERMEDIATE ADVISORY<br>NUMBER  11A<br>NWS NHC MIAMI FL        AL112015 | 18 hours after departure of the El Faro from Jacksonville.  Distance of the ship from the storm perimeter was about  147 miles |

| | |
|---|---|
| 200 PM EDT WED SEP 30 2015<br><br>...JOAQUIN CONTINUING TO STRENGTHEN...<br><br>SUMMARY OF 200 PM EDT...1800 UTC...INFORMATION<br>----------------------------------------------<br>LOCATION...24.4N 72.9W<br>ABOUT 190 MI...305 KM ENE OF THE CENTRAL BAHAMAS<br>MAXIMUM SUSTAINED WINDS...85 MPH...135 KM/H<br>PRESENT MOVEMENT...SW OR 230 DEGREES AT 6 MPH...9 KM/H<br>MINIMUM CENTRAL PRESSURE...968 MB...28.58 INCHES | |

50.  **Exh 8** is a Three Day Graphic Cone Warning for Advisory **#11A**.

**51.**  At no time following its publication did the "Designated Person" or any person in upper management contact El Faro to discuss the NHC Advisory **#11A** and the risks presented to the vessel and her crew.

52.  On Wednesday September 30th, at 5:00 pm the NHC issued **Bulletin Advisory #12** stating Hurricane Joaquin was moving SW toward Central Bahamas with maximum sustained winds of 85 mph and in other particulars the following:

| | |
|---|---|
| BULLETIN<br>HURRICANE JOAQUIN ADVISORY NUMBER  12<br>NWS NHC MIAMI FL      AL112015<br>500 PM EDT WED SEP 30 2015<br><br>...JOAQUIN MOVING | 21 hours after departure of the El Faro from Jacksonville. On information and belief the distance of the ship from the storm's periphery was about  80 miles |

| | |
|---|---|
| SOUTHWESTWARD TOWARD THE CENTRAL BAHAMAS...<br><br>SUMMARY OF 500 PM EDT...2100 UTC...INFORMATION<br>---------------------------------------------<br>LOCATION...24.3N 73.1W<br>ABOUT 175 MI...285 KM ENE OF THE CENTRAL BAHAMAS<br>MAXIMUM SUSTAINED WINDS...85 MPH...140 KM/H<br>PRESENT MOVEMENT...SW OR 225 DEGREES AT 8 MPH...13 KM/H<br>MINIMUM CENTRAL PRESSURE...967 MB...28.56 INCHES | |

53.  **Exh 9** is a Three Day Graphic Cone Warning for Advisory #**12.**


**54.**  At no time following its  publication did the "Designated Person" or any person in upper management contact El Faro to discuss the NHC Advisory #**12** and the risks presented to the vessel and her crew.


55. On Wednesday September 30th at about 5:00 pm., 21 hours after departing Jacksonville and approximately 80 miles from the periphery of  Hurricane Joaquin,  El Faro traveled past an escape route gap in the Bahamas archipelago, known as the "Hole in the Wall". Bypassing this escape route, El Faro instead took the shorter more direct route to San Juan which was east of the Bahamas but closer to Hurricane Joaquin.

56. On Wednesday September 30th, at 8:00 pm the NHC issued **Bulletin Advisory #12A** stating that Hurricane Hunter Aircraft found Joaquin stronger with sustained maximum winds now at 105 mph and in other particulars the following:

| | |
|---|---|
| BULLETIN<br>         HURRICANE JOAQUIN INTERMEDIATE ADVISORY NUMBER  12A<br>         NWS NHC MIAMI FL      AL112015<br>         800 PM EDT WED SEP 30 2015<br><br>         ...HURRICANE HUNTER AIRCRAFT FINDS JOAQUIN STRONGER...<br><br>         SUMMARY OF 800 PM EDT...0000 UTC...INFORMATION<br>         -----------------------------------------------<br>         LOCATION...24.0N 73.0W<br>         ABOUT 95 MI...150 KM E OF SAN SALVADOR BAHAMAS<br>         ABOUT 80 MI...125 KM NE OF SAMANA CAYS BAHAMAS<br>         MAXIMUM SUSTAINED WINDS...105 MPH...165 KM/H<br>         PRESENT MOVEMENT...SW OR 225 DEGREES AT 7 MPH...11 KM/H<br>         MINIMUM CENTRAL PRESSURE...954 MB...28.17 INCHES | 24 hours after departure of the El Faro from Jacksonville. On information and belief the distance of the ship from the storm periphery was  about 28 miles |

57. **Exh 10** is a Three Day Graphic Cone Warning for Advisory **#12A**.

58. At no time following its  publication did the "Designated Person" or any person in upper management contact El Faro to discuss the NHC Advisory **#12A** and the risks presented to the vessel and her crew.

59. On Wednesday September 30, at approximately 9:09 pm, 25 hours after departure from Jacksonville,. El Faro was approximately 35 miles northeast of the periphery of Hurricane Joaquin, and continuing directly into the center of a 250 mile wide storm.

60. On Wednesday September 30th, at 11:00 pm the NHC issued **Bulletin Advisory # 13** stating that Joaquin has now become a Category 3 Hurricane with sustained maximum sustained winds of 115 mph and in other particulars  the following:

| | |
|---|---|
| BULLETIN<br>HURRICANE JOAQUIN ADVISORY **NUMBER  13**<br>NWS NHC MIAMI FL       AL112015<br>1100 PM EDT WED SEP 30 2015<br><br>**...JOAQUIN BECOMES A CATEGORY 3 HURRICANE** AS IT MOVES TOWARD THE CENTRAL BAHAMAS...<br><br>SUMMARY OF 1100 PM EDT...0300 UTC...INFORMATION<br>----------------------------------------------<br>LOCATION...23.8N 73.1W<br>ABOUT 90 MI...145 KM E OF SAN SALVADOR<br>ABOUT 170 MI...275 KM E OF THE CENTRAL BAHAMAS<br>MAXIMUM SUSTAINED WINDS...115 MPH...185 KM/H<br>PRESENT MOVEMENT...SW OR 220 DEGREES AT 6 MPH...9 KM/H<br>MINIMUM CENTRAL PRESSURE...951 MB...28.09 INCHES | 27 hours after departure of the El Faro from Jacksonville. On information and belief the distance of the ship from the storm periphery is about 10 miles. El Faro is now within peripheral circle of tropical storm forces. |

61.    **Exh 11** is a Three Day Graphic Cone Warning for Advisory #13.

**62.**     At no time following its publication did the "Designated Person" or any person in upper management contact El Faro to discuss the NHC Advisory **#13** and the risks presented to the vessel and her crew.

63.     On Thursday October 1st, at 2:00 am the NHC issued **Bulletin Advisory # 13A** stating that Joaquin was heading for central Bahamas with 120 mph winds (Category 3) and in other particulars the following:

| | |
|---|---|
| BULLETIN<br>HURRICANE JOAQUIN<br>INTERMEDIATE ADVISORY<br>NUMBER  13A<br>NWS NHC MIAMI FL     AL112015<br>200 AM EDT THU OCT 01 2015<br><br>...JOAQUIN HEADING FOR THE<br>CENTRAL BAHAMAS WITH 120<br>MPH WINDS...<br><br><br>SUMMARY OF 200 AM EDT...0600<br>UTC...INFORMATION<br>---------------------------------------------<br>LOCATION...23.5N 73.4W<br>ABOUT 35 MI...55 KM NE OF<br>SAMANA CAYS BAHAMAS<br>ABOUT 80 MI...125 KM ESE OF SAN<br>SALVADOR BAHAMAS<br>MAXIMUM SUSTAINED<br>WINDS...120 MPH...195 KM/H<br>PRESENT MOVEMENT...SW OR 220<br>DEGREES AT 6 MPH...9 KM/H<br>MINIMUM CENTRAL<br>PRESSURE...948 MB...27.99 INCHES | 30 hours after departure of the El Faro from Jacksonville.  On information and belief El Faro was about 55 miles within the perimeter of tropical storm forces winds. |

64. **Exh 12** is a Three Day Graphic Cone Warning for Advisory **#13A**.

**65.** At no time following its publication did the "Designated Person" or any person in upper management contact El Faro to discuss the NHC Advisory **#13A** and the risks presented to the vessel and her crew.

66. On Thursday October 1st, at approximately 2:09 a.m. El Faro continued on a course directly towards the center of hurricane Joaquin. Her AIS reported position indicated she was about 50 miles from the eye of the hurricane making about 17 kts. Weather conditions that the ship was experiencing at this time included winds of in excess of 80 knots from the northeast a direction that would have induced extreme rolling. El Faro presumably still possessed the ability to change course and escape the storm.

67. On Thursday October 1st at approximately 3:56 a.m., El Faro's last logged location, indicated she was less than 50 miles from the eye of the hurricane and traveling at 10.7 knots, 1/2 her normal speed. El Faro presumably still possessed the ability to change course and escape the storm.

68. On Thursday October 1st, at 5:00 am the NHC issue **Bulletin Advisory # 14** stating that Joaquin will batter central Bahamas with maximum sustained winds of 120 mph and in other particulars the following:

| | |
|---|---|
| BULLETIN<br>HURRICANE JOAQUIN ADVISORY NUMBER 14<br>NWS NHC MIAMI FL      AL112015<br>500 AM EDT THU OCT 01 2015<br><br>...MAJOR HURRICANE JOAQUIN WILL BATTER<br>THE CENTRAL BAHAMAS WITH<br>HURRICANE FORCE WINDS...STORM | 34 hours after departure of the El Faro from Jacksonville. The ship is well inside the storm's periphery and being subjected to extreme battering by mountainous seas. |

<table>
<tr><td>

SURGE...AND HEAVY RAIN THROUGH
TONIGHT...


SUMMARY OF 500 AM EDT...0900
UTC...INFORMATION
----------------------------------------------
LOCATION...23.4N 73.7W
ABOUT 20 MI...35 KM N OF SAMANA CAYS BAHAMAS
ABOUT 65 MI...105 KM SE OF SAN SALVADOR
BAHAMAS
MAXIMUM SUSTAINED WINDS...120 MPH...195 KM/H
PRESENT MOVEMENT...WSW OR 240 DEGREES AT 5
MPH...7 KM/H
MINIMUM CENTRAL PRESSURE...948 MB...27.99
INCHES

</td><td></td></tr>
</table>

69. **Exh 13** is a Three Day Graphic Cone Warning for Advisory **#14.**

**70.**     At no time following its publication did the "Designated Person" or any person in upper management contact El Faro to discuss the NHC Advisory **#14** and the risks presented to the vessel and her crew.

71. On Thursday October 1st at approximately 7:00 a.m. and with the El Faro well within  the periphery of Hurricane  Joaquin, DAVIDSON initiated a call to the emergency call center of SEA STAR's and/or TOTE SERVICES advising that the situation aboard El Faro was a maritime emergency.  DAVIDSON reported a hull breach, i.e.  a scuttle had blown open, that the vessel was taking on water in hold number 3, that the vessel was listing 15 degrees, and that the vessel had lost power and the main propulsion.  In his opinion, the "situation was manageable".  This was  the last communication from the El Faro.

72. The routing decisions which brought El Faro to the point where she was in a maritime emergency were not based on maximizing the safety of the crew and vessel, but based on adherence to the vessel schedule.

73. At no time prior to DAVIDSON'S report of an emergency, did the Designated Person nor any one in upper management provide him with advice, support, instruction, guidance weather routing data or information of any description intended to lessen the dangers presented by Joaquin.

74. On Thursday October 1st at about 7:17 a.m. the U.S. Coast Guard received electronic distress alerts from the El Faro and its last reported position was about 20 miles from the edge of the eye of the hurricane.

75.   On Thursday October 1st On October 1st,  at 8:00 am the NHC issued **Bulletin Advisory # 14A** stating in part the following:

BULLETIN
HURRICANE JOAQUIN INTERMEDIATE **ADVISORY # 14A**
NWS NHC MIAMI FL      AL112015
800 AM EDT THU OCT 01 2015

...EYE OF JOAQUIN NEAR SAMANA CAYS IN THE BAHAMAS...
...CENTRAL BAHAMAS TO EXPERIENCE HURRICANE FORCE WINDS...STORM
SURGE...AND HEAVY RAIN THROUGH TONIGHT...

SUMMARY OF 800 AM EDT...1200 UTC...INFORMATION
----------------------------------------------
LOCATION...23.2N 73.7W
ABOUT 10 MI...15 KM N OF SAMANA CAYS BAHAMAS
ABOUT 75 MI...120 KM SE OF SAN SALVADOR BAHAMAS
MAXIMUM SUSTAINED WINDS...120 MPH...195 KM/H
PRESENT MOVEMENT...WSW OR 240 DEGREES AT 5 MPH...7 KM/H
MINIMUM CENTRAL PRESSURE...942 MB...27.82 INCHES

76. **Exh 14** is a Three Day Graphic Cone Warning for Advisory **#14A**.

77. On Oct. 1st, following unsuccessful search and rescue efforts, El Faro and her 33 person crew including Steven Shultz, were deemed lost at sea.

### International Management Safety Code

78. At all times relevant, Plaintiffs were required to have a safety management system (hereinafter 'SMS"), certified by the American Bureau of Shipping pertaining to the operation, management, control, and manning of the El Faro and other vessels in their fleet in accordance with Chapter IX The Safety of Life At Sea Convention, ("SOLAS") 1974 and as implemented by, 46 U.S.C. § 3201 et seq, and 33 CFR Part 96, entitled "Rules for the Safe Operation of Vessels and Safety Management Systems".

79. The ISM Code recognizes and codifies the responsibilities of shipping company management in ensuring adherence to marine safety guidelines, environmental protection standards and good and proper standards of marine practice. A dominant theme of the ISM Code is accountability, which, under the IMO, is not limited to shipmasters but is extended to the upper levels of company management. The ISM Code extends the responsibility for preparing for and responding to hazardous and emergency situations beyond shipmasters to include shore side management.

80. The Objectives (Of the ISM Code) are stated in Article 1.2 as follows

1.2.1 The objectives of the Code are to ensure safety at sea, prevention of human injury or loss of life, and avoidance of damage to the environment, in particular to the marine environment and to property.

1.2.2 Safety-management objectives of the Company should, *inter alia*:

.1 provide for safe practices in ship operation and a safe working environment;

.2 establish safeguards against all identified risks; and

.3 continuously improve safety-management skills of personnel ashore and aboard ships, including preparing for emergencies related both to safety and environmental protection.

1.2.3 The safety-management system should ensure:

.1 compliance with mandatory rules and regulations; and

.2 that applicable codes, guidelines and standards recommended by the Organization, Administrations, classification societies and maritime industry organizations are taken into account.

81. **Article 7** of the Code states the following:

7. Development of Plans for Shipboard Operations

The Company should establish procedures for the preparation of plans and instructions for key shipboard operations concerning the safety of the ship and the prevention of pollution. The various tasks involved should be defined and assigned to qualified personnel.

**Article 8** of the Code states the following:

8. Emergency Preparedness

8.1 The Company should establish procedures to identify, describe and respond to potential emergency shipboard situations.

8.2 The Company should establish programs for drills and exercises to prepare for emergency actions.

8.3 The SMS should provide for measures ensuring that the Company's organization can respond at any time to hazards, accidents and emergency situations involving its ships.

82. The above cited obligations under the ISM Code to provide safe practices in ship operation, a safe work environment, safeguards against all identified risks, plans and procedures for shipboard operations, and procedures to identify, describe and respond to

26

potential emergency situations,  <u>applies to potential emergencies created by hurricane,</u> <u>tropical storms and heavy weather sailing. The obligations imposed are not limited to solo</u> <u>decisions made by ship masters but extend to upper levels of ship management.</u>
(See NTSB Marine Incident Summary Report of Tank Ship Patriot, Apr. 8th, 1997 PB 97-916402 / NTSB/MAR-97/01/SUM )

*83.* At no time <u>prior</u> to the commencement of  subject voyage, did Plaintiffs' shore side management exhibit or display the slightest degree of  management oversight over El Faro and her master as is required by various provisions of the  ISM Code including Articles 1, 7 and 8 as set forth above. All decisions regarding the subject voyage, including when to, or not to, sail, the route chosen, route changes underway, the voyage plan, emergency preparedness, whether the condition of cargo that was difficult if not impossible to fully secure in advance of heavy rolling was adequately addressed, whether the El Faro was seaworthy and suitable for the intended voyage were ignored by management and defaulted to DAVIDSON.

*84.* At no time <u>during</u> the subject voyage did Plaintiffs exhibit or display the slightest degree of management oversight over El Faro and her master as is required by various provisions of the  ISM Code including Articles 1, 7 and 8 as set forth above. All decisions regarding the safety of vessel and crew including the continuation of the route chosen,  route changes underway,  changes to the voyage plan, whether the voyage should be continued, terminated or changed for safety of vessel and crew emergency preparedness, whether the El Faro was or remained seaworthy and suitable to continue for the  voyage  were ignored by management and defaulted to DAVIDSON.

85. At no time prior or during the subject voyage did Plaintiffs independently review, monitor, analyze weather data from the NHC and other governmental or private sources including weather routing universally utilized elsewhere throughout the maritime world to satisfy the responsibilities imposed by the ISM Code.

*86.* Weather routing is a universally used tool to minimize risk to life and property damage at sea.  Plaintiffs chose not to employ or utilize a weather routing service.  According to the National Geospatial –Inelligence Agency, Maritime Safety Information Chapter 37-  "*An effective routing service maximizes safety by greatly reducing the probability of severe or catastrophic damage to the ship, and injury of crew members. The efficiency and health of the crew is also enhanced by avoiding heavy weather"*

87. At no time prior or during the subject voyage did Plaintiffs' shore side operations department have available persons or mobilize a response team with expertise in meteorology, naval architecture, intact and damaged stability, and damage control, available to advise DAVIDSON as those subjects related to the subject voyage and as required to satisfy the responsibilities imposed by the ISM Code.

88.  At no time prior or during the subject voyage did Plaintiffs' shore side operations department discuss with DAVIDSON his understanding of meteorology, weather and sea conditions,  his ability to forecast future weather and sea conditions and in particular the "The Mariner's 1-2-3 Rule also known as the **"Danger Rule"** which is depicted in **Exh 15** or the **"34 KT Rule"**.   The **"Danger Rule"** refines with particularity the common sense, "*no brainer*" principle that driving a ship into or within close proximity of  a hurricane is always a  very very bad idea,  and that conversely driving a ship away from a hurricane is always a very good idea. The NHC web site describes the **"Danger Rule"** as follows: *"This is the single most important aid in accounting for hurricane forecast track errors. Understanding the & use of this technique should be mandatory for any vessel operating near a hurricane ."*   The NHC web site describes the 34 KT Rule as follows:

*"For vessels at sea, avoiding the 34 KT wind field of a hurricane is paramount. 34 KT is chosen as the critical value because as wind speed increases to this speed, sea state development approaches critical levels resulting in rapidly decreasing limits to ship maneuverability. It also deserves mention that the state of the sea outside of the radius of 34 KT can also be significant enough as to limit course & speed options available to the mariner and must also be considered when avoiding hurricanes."*

89. At no time prior or during the subject voyage did Plaintiffs shore side operations department discuss, advise or educate  DAVIDSON regarding the risks and ramifications of the continuous stream of weather data made available from the NHC and other governmental sources, particularly in the context of the "Mariner's Danger Rule" or the 34 KT as required to satisfy the responsibilities imposed by the ISM Code.  Specifically, in not one NHC Advisory cited below did Plaintiffs discuss, question or interrogate DAVIDSON as to his understanding of the risks, exposures, and dangers presented to El Faro and her crewmembers and the "soundness" of his sailing plan.

    a.   NHC **Advisory #5** (Monday at 11pm) concerning Tropical Storm Joaquin, moving southwest with sustained speeds of 40 mph.

    b.   NHC issued **Advisory #6 (Tuesday at** 5 am) concerning Tropical Storm Joaquin, slow strengthening is forecast during the next 48 hours.

    c.   NHC issued **Advisory #7** (Tuesday at 11am) maximum sustained winds have increased to 45 mph. Some strengthening is forecast during the next 48 hours.

    d.   NHC **Advisory #8**  (Tuesday at 5 pm) stating that "Joaquin could become a hurricane on Wednesday",  and that "maximum sustained winds had increased to near 65 mph";

    e.   NHC **Advisory #9** (Tuesday at 11 pm) stating that "Joaquin is forecast to become a hurricane later tonight or Wednesday" with "maximum sustained winds increased to 70 mph".

    f.   NHC **Advisory #9A** (Wednesday 2 am) stating "Joaquin is expected to become a hurricane soon" ,

    g.   NHC **Advisory #9A** (Wednesday 2 am) stating "Joaquin is expected to become a hurricane soon",

h.  NHC **Advisory #10** (Wednesday 5 am) providing a "Hurricane Warning for Central Bahamas",

i.  NHC **Advisory #10**A (Wednesday 8 am) stating that that "Joaquin was now a Hurricane with maximum sustained winds of 75 mph" ,

j.  NHC **Advisory #11** (Wednesday11 am) stating that "Joaquin strengthens some more as it moves southwestern toward the Central Bahams … with maximum sustained winds … 80 mph." ,

k.  NHC **Advisory #11A** (Wednesday 2pm) stating  that "Joaquin continued to strengthen some more as it moves southwestern toward the Central Bahams … with maximum sustained winds … 85 mph." ,

l.  NHC **Advisory #12** (Wednesday  5 pm) stating  that "Joaquin was moving SW towards Central Bahamas with maximum sustained winds … 85 mph."

m.  NHC **Advisory #12A** (Wednesday  8 pm) stating that "Hurricane Hunter Aircraft found Joaquin stronger with sustained maximum winds now at 105 mph."

n.  NHC **Advisory #13** (Wednesday  11 pm) stating that "Joaquin had now become a Category 3 Hurricane with sustained maximum winds now at 115 mph.",

o.  NHC **Advisory #13A** (Thursday 2 am) stating that "Joaquin was heading for central Bahamas with sustained maximum winds now at 120 mph.",

p.  NHC **Advisory #14** (Thursday 5 am) stating that "Joaquin will batter central Bahamas with sustained maximum winds now at 120 mph.",

90. At no time prior or during the subject voyage did Plaintiffs shore side operations department discuss with DAVIDSON  issues of intact and damaged stability and damage control as required to satisfy the responsibilities imposed by the ISM Code.

91. At no time prior or during the subject voyage did Plaintiffs shore side operations department discuss with DAVIDSON what, if any, extraordinary precautions had been taken to adequately secure heavy equipment carried as cargo whose failure to remain secured while at sea would imperil the ship and present an enormous threat to the survival of the crew.

92. At no time prior or during the subject voyage did Plaintiffs Safety Management System incorporate or have in place risk analysis procedures and related criteria as required by various provisions of the ISM Code including sections 1.2, 7 & 8 to recognize, assess, and respond to the potential and actual threat posed to El Faro by hurricanes tropical storms and heavy weather, or to conduct failure mode and effects analysis of the reliability of critical shipboard systems to function in hurricanes, tropical storms and other heavy weather situations or procedures to assess how crewmembers would be able to effect damage control with cargo incorporating a high level of inherent vice and under conditions of excessive rolling, pitching and slamming or undertake survival actions.

**Specifically, procedures and criteria were lacking to assess risks of loss of electrical power, loss of boilers and blackouts and loss of the main propulsion arising from;**

    a. Excessive pitching, rolling and slamming on critical engine room systems and components,

    b. Fuel oil and lube oil strainers becoming clogged, overwhelmed and ineffective due to sediment loosening and accumulating inside storage, day tanks, double bottoms and sumps,

    c. Loss of power, maneuverability and the ability of the vessel to remain upright in beam seas with heavy equipment cargo adrift and progressively damaging the ship's structure

    d. Main engine automatic shut downs due to over speed protective devices from partially submerged and excessive propeller speeds.

    a. Incidents of boiler shut down to prevent priming and carryover to the main turbines,

b.  Incidents of electric generators, shutting down on protective devices due to loss of pump suctions in excessive rolling.

c.  Incidents of damages stability from "blown" or damaged watertight hatches, covers and similar fittings causing flooding and bilging.

**Procedures and criteria were lacking to assess the effectiveness and ability of crewmember to undertake damage control and evacuation evolutions in hurricane conditions, specifically;**

d.  The ability and physical limitations of crewmembers attempting to move about the vessel with tools, gear etc. in excessive rolling and pitching and slamming to undertake damage control either wearing or not wearing life vests and survival suits.

e.  The ability and physical limitations of crewmembers attempting to move about in the engine spaces with tools, gear etc. to restart the plant, and main propulsion system, electric generators and other vital components.

**Procedures and criteria were lacking to assess the effectiveness and ability of crewmembers to conduct survival actions: specifically;**

f.  The ability and physical limitations of crewmembers attempting to launch open type life boats or life rafts under sea states and 100 plus mph winds created in hurricane conditions.

93. At no time prior or during the subject voyage did Plaintiffs have in place well-defined "lines of communication between and amongst, shore and shipboard personnel". Plaintiffs organization was not prepared as required to respond in a way that would have prevented this incident.

94. On Wednesday September 30th at approximately 6:16 a.m., El Faro began deviating from its usual straight-line route to San Juan, Puerto Rico, shifting closer to the Bahamas, but still headed towards the storm at or near full speed. Plaintiffs were aware, should have been aware and certainly had the ability to become aware of that course change which was clearly contrary with any credible plan. At approximately 10:00AM, DAVIDSON sent a communication to SEA STAR and/or TOTE SERVICES indicating that he understood the

32

weather conditions in his intended path, that he had a **"sound plan",** that his crew was well prepared and briefed and that in his opinion weather conditions looked favorable. At no time however did Plaintiffs intervene, or countermand DAVIDSON'S decision which was on its face horribly contrary to the Danger Rule, the 34 KT rule and proper standards of seamanship and common sense. The so called **"sound plan"** was not a plan made with an informed judgment predicated on the type of risk analysis required by the ISM Code. In reality the "plan" was nothing more than a *one shot bet the farm, Hail Mary,* attempt to skirt past hurricane Joaquin, in the naïve expectation that this 40 years old relic of a ship would just hum along like a Swiss watch under the relentless battering and power of a Category 3-4 hurricane and with cargo that posed a severe threat to the ship under any conditions of sustained heavy rolling. At no time did Plaintiffs demand that DAVIDSON articulate the risks of his so called **"sound plan";** or demand that he articulate with specificity the ability of his crew to response to any number of potential emergencies such as flooding, unsecured and adrift trucks and trailers, bilging, loss of electric power, loss or main propulsion, launching of lifeboats, life-rafts etc. and most importantly why risking the lives of 33 crewmembers and the ship was a **"sounder plan"** than;

    a. taking the escape route gap in the Bahamas archipelago, known as the "Hole in the Wall" or

    b. reversing course and head away from the storm; or

    c. change course and heading towards Florida;

95.    Plaintiffs, whose web site touts experience in the Jones Act trade, for over 30 years, well know that the complexity of marine power plants do not allow for Swiss watch performances and that water tight hatches and closures do not invariably maintain their seaworthiness. Review of the history of maritime casualties shows that the loss of power and propulsion and the ability to maintain watertight integrity occurs for expected and unexpected reasons with regularity, even in the absence of heavy weather. The recent incident involving Plaintiffs' vessel the MV North Star, is a spectacular case in point. On Nov. 24th, 2015, the media reported that under ideal sea and weather conditions the MV North Star travelling from Anchorage to Tacoma lost main

propulsion at a location approximately 45 miles west of Skidegate Channel, Haida, Gwaii. Although required by 46 CFR § 4-05-1(4) to be reported immediately, to the Coast Guard, the incident was not reported.[1] Instead by routine monitoring, the Canadian Coast Guard Prince Rupert Maritime Communications and Traffic Services (MCTS) became aware of the casualty based on the observed irregular AIS signals from the MV North Star. After MV North Star was contacted by MCTS, she acknowledged propulsion was lost due to an electrical failure. MCTS believed the situation was serious enough to warrant sending three vessels to safely guide the North Star to port. MV North Star is a relatively new vessel built in 2003, not to substandard foreign specifications, but to the exact and demanding U.S. standards in a premier American shipyard. For such reasons alone, Plaintiffs total disregard of their ISM responsibilities, in the matter of the El Faro, their abject abdication of management responsibilities to DAVIDSON, their complicity in allowing him to take the El Faro, a relic of a ship and her 33 crewmembers into a Category 3-4 Hurricane knowing full well that there is and can be no back-up emergency plan to deal with loss of propulsion, loose trucks and trailers tossing around without restriction in cargo spaces, loss of water tight integrity or survival when in the claws of a Hurricane; is unequivocally the most egregious, reckless example of vessel management since the HMS Bounty Organization LLC allowed Captain Robin Waldbridge to take the Tall Sail vessel HMS Bounty into the Atlantic to meet *Frankenstorm Sandy*. That encounter which resulted in the sinking of HMS Bounty with loss of life, was the greatest mismatch between a vessel and a peril of the sea that had ever occurred or could ever have been imagined, until now.

---

[1] Neither was a "Pan-Pan" issued, to inform potential rescuers (including emergency services and other craft in the area) that a safety problem exists.

**COUNT I – SURVIVAL PRE-DEATH PAIN AND SUFFERING and WRONGFUL DEATH  ACTION FOR NEGLIGENCE UNDER THE JONES ACT 46 USC § 30104 AGAINST PLAINTIFFS TOTE SERVICES  AND SEA STAR**

96. Claimant re-alleges, adopts, and incorporates by reference the allegations contained within paragraphs 1 through 95  as though set forth fully herein.

97. At all times material, Claimant's decedent Steven Shultz was employed by TOTE SERVICES  and/or SEA STAR as a seaman aboard the vessel El Faro with the rating of Chief Officer.

98. At all relevant times Plaintiffs owed Steve Shultz, Claimant's decedent a duty of reasonable care for  his  safety, including the duty to maintain the vessel in a reasonably safe and seaworthy condition and to operate the vessel safely in accordance with applicable laws, regulations and proper standards maritime practice.

99. By reason of the foregoing and all paragraphs incorporated by reference herein, Plaintiffs breached their duties. Their acts and omissions constitute negligent, willful, wanton, reckless violations of applicable law, regulation, and proper standards of care by reason of the above and by reason of the following:

    a.  Failing to have and or comply with  Safety Management System which contained procedures and criteria to comply with Articles 1.2, 7 and 8 and other relevant provisions of the ISM Code  and implementing US statutes, laws and regulations,

    b.  Failing to have a properly trained, educated, and knowledgeable Designated Person (DP) as required by the ISM Code;

    c.  Failure of the  DP to discharge his/her responsibility to create the proper mind-set, attitudes and behavior of the company employees working ashore in support of a vessel's operations as required by the ISM Code and proper standards of marine practice,

    d.  Failure of the DP to discharge his/her responsibility to support and promote a positive attitude to safety and environmental protection by those working on ships as required by the ISM Code and proper standards of marine practice,

35

e. Failure of upper management levels to discharge their responsibility to create the proper mind-set, attitudes and behavior of the company employees working ashore in support of a vessel's operations as required by the ISM Code and proper standards of marine practice,

f. Failure of upper management levels to discharge their responsibility to support and promote a positive attitude to safety and environmental protection by those working on ships as required by the ISM Code and proper standards of marine practice,

g. Abdicating management responsibilities required by the ISM Code and proper standards of marine practice, and allowing DAVIDSON to engage in reckless decision making;

h. Ignoring and or failing to act responsibly with knowledge of warnings, alerts and bulletins of National Hurricane Center, Marine Advisories, news and other media concerning Joaquin.

i. Allowing El Faro to proceed to sea with a master who lacked adequate knowledge as to weather forecasting, meteorology, oceanography, hurricane tracking, and hurricane avoidance or who lacked the ability to make sound passage plan / routing decisions.

j. Allowing El Faro to proceed to sea without a shore side support staff knowledgeable in weather forecasting, meteorology, oceanography, hurricane tracking, and hurricane avoidance and capable of assessing the risks and dangers of operating vessels in areas having hurricanes and in heavy weather.

k. Failing to recognize DAVIDSON'S so called "Sound Plan" was totally contrary to all precepts of heavy weather sailing.

l. Ignoring the NHC warnings of a progressively increasing dangerous situation as Tropical storm Joaquin increased to a category 3-4 hurricane and repeatedly ignoring the NHC Mariners 1-2-3 Danger Rule and 34 KT rule.

m. Failing to demand DAVIDSON articulate with particularity how the ability of his crew to respond to potential emergencies from flooding, bilging, unsecured and adrift trucks, trailers, loss of electric power, main propulsion, launching of life boats and life rafts, comported with is "sound plan".

n. Failing to demand DAVIDSON articulate with particularity the basis of his opinion that El Faro would not likely sustain emergencies such as flooding, bilging,

unsecured and adrift trucks, trailers, loss of electric power, main propulsion or damage to life boat davits and launching gear.

o.  Failing to adequately monitor and supervise DAVIDSON;

p.  Failing to insure that Davidson was fully aware of the risks imposed by Joaquin.

q.  Failing to review and discuss with DAVIDSON, El Faro's stability characteristics, her actual state of stability on departure from Jacksonville and potential emergency conditions that would adversely affect stability.

r.  Failure to use reasonable care to provide and maintain a safe place to work, fit with proper and adequate machinery, crew and equipment;

s.  Failure to promulgate and enforce reasonable rules and regulations to insure the safety and health of the employees while engaged in the course of his employment on said vessel;

t.  Failure to use reasonable care to inspect El Faro, its equipment, and its cargo;

u.  Failure to use reasonable care to maintain El Faro and its equipment in a seaworthy condition,

v.  Allowing El Faro to take a dangerous and hazardous course and route towards a hurricane, in close proximity to a hurricane and into a hurricane;

w.  Failing to order that El Faro divert  and/or seek safe harbor before encountering the hurricane;

x.  Failing to take a safe route from Jacksonville, Florida to San Juan, Puerto Rico;

y.  Failing to review and consider Davidson's previous work history and his suitability for command;

z.  Failure to have a shoreside management team capable of assessing the ability of the crew to respond to damage control, emergency evolutions in hurricane and heave weather conditions.

aa. Failing to use reasonable care to promulgate and/or enforce adequate policies and procedures to ensure that the vessel was operated in a reasonably safe manner;

bb. Failure to provide adequate training, instruction, and supervision to DAVIDSON and other masters employed by Plaintiffs'

cc. Failure to promulgate and/or enforce adequate policies and procedures to ensure that safety would not be compromised for cost and/or delay;

dd. Intentionally placing the lives of the crewmembers, the vessel and her cargo at extreme risk for the sole purpose of financial gain.

100. By reason of the above, and as a direct and proximate result of the above, fault, design, neglect, willful, wanton, and reckless acts and omissions of the Plaintiffs and Unseaworthiness of the El Faro, Steven Shultz suffered severe injuries, pre-death conscious pain and suffering, and ultimately died when the El Faro sank 15,000 feet to the ocean bottom.

101. **WHEREFORE**, Claimant demands damages as allowed under the Jones Act, 46 USC §30104, including but not limited to compensatory damages, pecuniary damages, loss of support, loss of past and future earnings, loss of fringe benefits, loss of services, loss of nurture and guidance and instruction,  funeral expenses, loss of inheritance, loss of enjoyment of life, pre-death physical and mental pain and suffering, and funeral expenses, and all other damages allowable by law, including punitive damages.  Claimant also demands a trial by jury for all issues so triable, and any other relief this Court deems proper.

## COUNT II – UNSEAWORTHINESS and NEGLIGENCE UNDER THE GENERAL MARITIME LAW AGAINST PLAINTIFFS TOTE AND SEA STAR

102. Claimant re-alleges, adopts, and incorporates by reference the allegations contained within paragraphs 1 through 95 and 99 as though set forth fully herein.

103. At all times material, Claimant's decedent Steven Shultz was employed by TOTE SERVICES  and/or SEA STAR as a seaman aboard the vessel El Faro with the rating of Chief Officer.

104. At all times material hereto, Plaintiffs had a non-delegable duty to provide a seaworthy vessel: tight, staunch, strong, and properly or competently manned, equipped, and supplied, and fit and proper for the service in which she was engaged, including adequate policies and procedures. At all relevant times Plaintiffs owed Steve Shultz, Claimant's decedent a duty of reasonable care for  his  safety, including the duty to maintain the vessel in a reasonably safe and seaworthy condition and to operate the vessel safely in accordance with applicable laws, regulations and proper standards maritime practice.

**105.** By reason of the foregoing and all paragraphs incorporated by reference herein, Plaintiffs breach their duties. Their acts and omissions constitute negligent, willful, wanton, reckless violations of applicable law, regulation, and proper standards of care and rendered the El Faro **UNSEAWORTHY.**

106. By reason of the above, and as a direct and proximate result of the above, fault, design, neglect, willful, wanton, and reckless acts and omissions of the Plaintiffs and Unseaworthiness of the El Faro, Steven Shultz suffered severe injuries, pre-death conscious pain and suffering, and ultimately died when the El Faro sank 15,000 feet to the ocean bottom.

107. WHEREFORE, Claimant demands damages as allowed under the General Maritime Law of the United States, including but not limited to compensatory damages, pecuniary losses, loss of support, past and future earnings, loss of services, loss of fringe benefits loss of nurture and guidance and instruction, funeral expenses, loss of inheritance, loss of enjoyment of life, pre-death physical and mental pain and suffering, and funeral expenses and all other damages allowable by law, including punitive damages. Claimant also demands a trial by jury for all issues so triable, and any other relief this Court deems proper.

## COUNT III – DEATH ON THE HIGH SEAS ACT (46 USC §30301 et seq.) AGAINST PLAINTIFFS TOTE MARITIME AND SEA STAR

108. Claimant re-alleges, adopts, and incorporates by reference the allegations contained within paragraphs 1 through 95 and 99 as though set forth fully herein.

109. At all times material hereto, Plaintiffs TOTE MARITIME and/or SEA STAR owed Claimants' decedent Steven Shultz  a duty of reasonable care under the Death on the High Seas Act, 46 U.S.C.§ 30301 et seq., including the obligation to provide a Seaworthy vessel.

110. By reason of the foregoing and all paragraphs incorporated by reference herein, Plaintiffs breached their duty and standard of care owed to Claimant's decedent,  Their acts and omissions constitute negligent, willful, wanton, reckless violations of applicable law, regulation, and proper standards of care and rendered the El Faro Unseaworthy and were the direct and proximate cause of decedent's death.

111. By reason of the above, and as a direct and proximate result of the above, fault, design, neglect, willful, wanton, and reckless acts and omissions of the Plaintiffs and Unseaworthiness of the El Faro, Steven Shultz suffered severe injuries, pre-death conscious pain and suffering, and ultimately died when the El Faro sank 15,000 feet to the ocean bottom.

112. **WHEREFORE**, Claimant demands damages as allowed under the Death on the High Seas Act, 46 USC §30301 et seq., and/or any other applicable wrongful death and/or survival act, including to but not limited compensatory damages, pecuniary losses, loss of support, past and future earnings, loss of services, loss of fringe benefits loss of nurture and guidance and instruction, funeral expenses, loss of inheritance, loss of enjoyment of life, pre-death physical and mental pain and suffering, and funeral expenses and all other damages allowable by law, including punitive damages. Claimant also demands a trial by jury for all issues so triable, and any other relief this Court deems proper.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished to all counsel of record via the EM/ECF system this  7thday of December, 2015.

Ralph J. Mellusi (to be Admitted Pro Hac Vice)
Tabak Mellusi & Shisha LLP
Plaintiff's Attorneys Pro-Hac-Vice
29 Broadway Suite 2311
New York, N.Y. 10006-3211
Tel: 212 -962-1590
                                        and

LIPCON, MARGULIES,
ALSINA & WINKLEMAN, P.A.
Attorneys for Plaintiffs
One Biscayne Tower, Suite 1776
2 South Biscayne Boulevard
Miami, Florida  33131
Telephone:  (305)  373-3016


 /s/ *Jason R. Margulies*
JASON R. MARGULIES
FL BAR NO. 57916
E-mail: JMargulies@lipcon.com

MICHAEL A. WINKLEMAN
FL BAR NO. 36719
E-mail: MWinkleman@lipcon.com