UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

IN ADMIRALTY

In the Matter of the Complaint

of                                                                    Case No. 3:15-cv-1297-HES-MCR

Sea Star Lines, LLC, d/b/a TOTE
Maritime Puerto Rico, as owner; and
TOTE Services, Inc., as Owner *pro hac
vice* of the *S.S. El Faro* for Exoneration
from or Limitation of Liability
_____/

DISPOSITIVE MOTION OF CLAIMANTS RIEHM AND
HATCH FOR SUMMARY JUDGMENT ON
SHIPOWNERS' COMPLAINT FOR EXONERATION
FROM OR LIMITATION OF LIABILITY WITH
SUPPORTING MEMORANDUM OF LAW

Tina Riehm, as Personal Representative of the Estate of Jeremie H. Riehm,
deceased; and Tracey Hatch, as Personal Representative of the Estate of Carey Hatch,
deceased (referred to herein as "Claimants") as defendants and claimants in this action
and plaintiffs in Case No. 3:15-cv-1296-HES-MCR and Case No. 3:15-cv-1317-HES-
JBT, pursuant to Fed.R.Civ.P. 56, move for summary judgment in this action.  In support
of their motion, the Claimants would show this Honorable Court that there are no genuine
issues of material fact, and the record conclusively demonstrates that the Plaintiffs
(referred to herein as "Shipowners") negligently approved the ship captain's plan to sail
the vessel into close proximity of a tropical storm that was forecast to become a hurricane
and then negligently failed to order the captain to change his reckless course as he sailed
directly toward the hurricane, and that this negligence was within the knowledge and

privity of the Shipowners.  Therefore, the Claimants pray that this Court will grant them summary judgment in this action and allow them to pursue their remedies under the Jones Act and the Death on the High Seas Act.

MEMORANDUM

SUMMARY OF THE ARGUMENT

Against the backdrop of a law enacted in 1851 to level the field between American and European shipowners by protecting "physically remote owner who . . . has no effective control over his waterborne servants[,]"[1] this case presents a relatively straightforward legal question for the Court.  In 2015, are shipowners entitled to limit their liability after they approve the decision to sail a loaded 40-year-old container ship directly into an approaching hurricane, but disclaim liability and knowledge in federal court when the risky plan to skirt the storm fails and all 33 sailors are lost?

Although discovery has not yet begun, this case presents an unusual set of circumstances where the facts permit but one conclusion –the limitations action must fail as a matter of law.  The *El Faro* sank because, despite repeated warnings from the National Hurricane Center as well as modern communication and navigational systems, she sailed directly into the path of a hurricane.  This reckless course was not caused by a unilateral mistake by the captain.  Instead, it was known to and approved by the Shipowners, who negligently agreed with the captain's plan to sail the vessel into close proximity of a tropical storm that was forecast to become a hurricane.  Then, as the voyage progressed, Shipowners negligently compounded their error by failing to order

---

[1] *Tittle v. Aldacosta*, 544 F.2d 752, 756 (5th Cir. 1977).

the captain to deviate from this course after it became clear that their ship was headed straight toward the storm. Thus, the Shipowners not only had knowledge and privity of the captain's reckless plan, they were parties to it.

Furthermore, since the Shipowners cannot meet their burden to prove that they lacked knowledge and privity of the captain's plan, they cannot prevail on their claim for limited liability, so that there is no reason for this Court to continue to exercise its admiralty jurisdiction. *See Fecht v. Makowski,* 406 F.2d 721 (5th Cir. 1969). Therefore even if this Court should conclude that triable liability issues remain, this case should be dismissed so that the Claimants will be free to pursue their claims in state court.

## SUMMARY OF THE UNDISPUTED MATERIAL FACTS
## AND THE STATUS OF THE CASE

On October 1, 2015, the *SS El Faro*, a container vessel, sank off of the Bahama Islands during Hurricane Joaquin. The *El Faro* had sailed from Jacksonville on the previous day, bound for San Juan, Puerto Rico. At the time the *El Faro* left port, Joaquin was a tropical storm that was forecast to become a hurricane by the following morning. As demonstrated by the affidavits of John Soutar (attached as Exhibit 1) and John Becker (attached as Exhibit 2), the captain of the *El Faro* not only left port on an intended course that would take the ship close to the projected track of Joaquin, but he continued toward the storm as it strengthened into a hurricane, missing several opportunities to change course and avoid the storm. As the affidavits and the attached transcript of a press conference of Shipowners' top managers (attached as Exhibit 3) show, at all times during the voyage the Shipowners knew or should have known that the ship was sailing into a hurricane.

Based on these facts, each of the Claimants has sued the Shipowners, Sea Star Line, LLC, d/b/a "Tote Maritime," and Tote Services, Inc., in state court, asserting claims for negligence under the Jones Act, 46 U.S.C. § 30104, and unseaworthiness under the Death on the High Seas Act, 46 U.S.C. § 30301.  In both cases the Claimants have demanded their rights to jury trials.  The Shipowners removed these cases to this Court, but the Claimants have moved to remand both cases to state court on the ground that Jones Act cases are not removable.  Those motions to remand are currently pending.  The Shipowners also filed this admiralty action for exoneration or limitation of liability, asking this Court to determine that they are not liable for any loss or damage resulting from the loss of the *El Faro* and her crew or, if they are liable, they are entitled to limitation of liability because, if any fault or unseaworthy condition contributed to the loss of the ship, it occurred "without the privity or knowledge of her master, any superintendent, managing agent, or those for whose acts [Shipowners] may be responsible." (Doc. 1, paragraphs 11 and 12)  The Claimants have filed answers and counterclaims alleging negligence of which the Shipowners had knowledge and privity. (Docs. 55 & 57)

The Claimants' allegations against the Shipowners:

The Claimants' allegations against the Shipowners are identical: both complaints contain counts for negligence under the Jones Act and for unseaworthiness under the Death on the High Seas Act.  The Jones Act counts allege that the Shipowners were negligent in "ordering or permitting" the *El Faro* to sail into extremely dangerous weather knowing that there was a tropical storm and, later, a major hurricane, in or near

the intended route of the ship, and in failing to instruct the ship's captain to remain in port or to plot a course around the storm.

To support summary judgment on those claims Claimants have filed the affidavits of John Soutar, an actuary and data analyst, and John Becker, an experienced mariner and licensed ship's master. The Soutar affidavit and attached graphic representations of the course of the *El Faro* and the track of Joaquin are graphic proof that throughout the voyage the captain of the ship sailed directly into the path of the hurricane without any significant deviation in his course. (Soutar affidavit, paragraphs 10 & 11 and Exhibit C) The Soutar affidavit also demonstrates that the *El Faro* could have easily avoided the storm simply by changing course, as it was moving at a speed of 18-20 knots, while the storm was moving much more slowly—a rate of 5-8 knots. (*Id.* at paragraph 11) With regard to the Shipowners burden to prove lack of knowledge and privity, the Soutar affidavit states that tracking data showing that the ship and storm were on a collision course was available *in real time during the voyage* and available to the public within minutes after it was generated. (*Id.* at paragraph 9)

The Becker affidavit states that the captain of the *El Faro* sailed directly into the path of the storm and missed or ignored many opportunities to deviate from this obviously reckless course. (Becker affidavit, paragraphs 13 & 17) With regard to the knowledge and privity of the Shipowners, Becker states that they had real time access to the course of the ship and the path of the hurricane, and that the owners could have ordered the captain to avoid the storm. (*Id.*) Sailing straight toward the storm constituted

negligence on the part of the captain and the Shipowners.  (Becker affidavit, paragraphs 15 and 16)

In fact, as Becker's affidavit demonstrates, the reckless navigation of the ship after it left port was merely an extension of a wildly ill-conceived plan made before the ship left port.  Becker states that the original plan described by the Shipowners' management at their press conference announcing the loss of the *El Faro*, *to sail toward the storm and then attempt to maneuver around it*, was "reckless and negligent and following that plan was a proximate cause of the loss of the vessel and of the crew." (Becker affidavit, paragraph 17)

Claimants have also filed a transcript of the press conference mentioned in Becker's affidavit (attached as Exhibit 3).  In that press conference the Shipowners' top management admitted that they were aware of and approved the captain's risky plan to deliver the cargo as scheduled despite the hurricane in the ship's path.   They acknowledged that: (i) TOTE was aware of the plan to sail the *El Faro* toward the developing storm; (ii) TOTE "absolutely" had the ability and authority to stop the ship or direct it to turn around if TOTE disagreed with the captain's plan; and (iii) the ultimate responsibility for navigational decisions rested with TOTE, as the following questions and answers show:

> REPORTER:  Basically, what they're asking is if anybody from [TOTE] ever said, "Hey, man.  That looks like its right in the path of this hurricane. Shouldn't you go this other way?"  Did that conversation take place?
>
> MR. GREEN:  As I have conveyed before, the captain laid out his plan and had given his plan.  And given what he had in the way of information about the weather system, his plan was a sound plan that would have

enabled him to clearly pass around the storm with a margin of comfort that was adequate in his professional opinion. (Transcript, Ex. 3 pp. 12-13)

* * *

REPORTER: Can you guys override him as the captain of the ship?

Speaker 2 [Philip H. Greene, Jr., President & CEO of Tote Services, Inc]: We certainly can.

Speaker 1 [Anthony Chiarello, President and CEO of Tote, Inc.]: Absolutely.

MR. GREENE:  We certainly can. (Transcript, p. 12).

* * *

[Anthony Chiarello]:   I'm the president and CEO of Tote.   So the responsibility ends with me.  (Transcript, p. 12).

The relevant statutes:

The Jones Act:

The Jones Act, 46 U.S.C. § 30104 gives seamen the same rights as railroad workers to recover against their employers, expressly including the right to trial by jury:

> A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section.

(46 U.S.C. § 30104)   The Federal Employers' Liability Act, commonly known as "FELA," provides that a railroad employee may recover against the railroad for injuries caused by "officers, agents, or employees" of the railroad. (45 U.S.C. § 51)

Accordingly, the Shipowners in this case are vicariously liable for the actions of the *El Faro's* captain.

The "saving to suitors" clause:

Title 28, U.S.C. § 1333 gives the federal courts exclusive, original jurisdiction over all cases in admiralty but expressly "sav[es] to suitors in all cases all remedies to which they are otherwise entitled."  It is undisputed that this clause allows an injured party to file his or her Jones Act claim in state court, as the Claimants have done here. *See, e.g., Lewis v. Lewis & Clark Marine, Inc.,* 531 U.S. 438 (2001).

The "Limitation Act:"

The "Limitation Act," 46 U.S.C. § 30505(b) grants a shipowner limitation of liability for negligence or unseaworthy conditions when the shipowner lacks "privity or knowledge" of the negligence or unseaworthiness.  The knowledge of the ship's master at the beginning of the voyage is imputed to the shipowner. 46 U.S.C. § 30506(e).

The issues and burdens of proof in the Limitation Action:

The Shipowners' exoneration claim:

The Limitation Act does not expressly provide for a shipowner to seek exoneration from a claim.  However, that remedy has been judicially recognized and is codified in Rule F of the Supplemental Rules for Admiralty, which provides that in a limitation action, the complaint "may demand exoneration from as well as limitation of liability." Supplemental Rule F, Local Rule 7.01(b).  In an action for exoneration, the shipowner has the burden of proving that it, its vessel, and its crew were all free from fault. *Hercules Carriers, Inc. v. Claimant St. of Fla. Dept. of Trans.,* 768 F.2d 1558,

1582 (11th Cir. 1985); *Matter of Palmer Johnson Savannah, Inc.,* 1 F.Supp. 2d 1377, 1382 (S.D. Ga. 1997); and *Matter of Adventure Bound Sports, Inc.,* 837 F.Supp. 1244, 1253 (S.D. Ga. 1993).

The claim for limitation of liability:

The purpose of the Limitation Act, which became law in 1851, was to level the playing field between American and European Shipowners by limiting the liability of a "physically remote owner who . . . has no effective control over his waterborne servants"[2] and thus might have had no knowledge of any negligence or unseaworthy condition that may have contributed to the loss or damage.  On the claim for limitation (in contrast to the exoneration claim), the injured claimant has the initial burden of proof and ordinarily must prove that the injury was caused by at least one act of negligence or an unseaworthy condition of the vessel.  *Suzuki of Orange Park, Inc. v. Shubert,* 86 F.3d 1060, 1062-63 (11th Cir. 1996)  The burden then shifts to the party seeking limitation to prove that it lacked "knowledge and privity" of the negligence or unseaworthy condition. (*Id.*)  However, the Supreme Court and the Fifth Circuit, in a decision rendered before the creation of the Eleventh Circuit, have both made it clear that the claimant must only establish liability in the limitation action if there is a possibility that the shipowner's right to limitation of liability will be affected by allowing the case to proceed in state court. *See Lewis v. Lewis & Clark Marine, Inc.,* 531 U.S. 438 (2001) and *Fecht v. Makowski,* 406 F.2d 721 (5th Cir. 1969).

---

[2] *Tittle v. Aldacosta*, 544 F.2d 752, 756 (5th Cir. 1977).

ARGUMENT

I

CLAIMANTS ARE ENTITLED TO SUMMARY
JUDGMENT ON THEIR CLAIM THAT THE LOSS OF
THE *EL FARO* WAS CAUSED BY THE NEGLIGENCE
OF THE SHIPOWNERS AND THEIR CAPTAIN IN
PLANNING AND EXECUTING A VOYAGE THAT
TOOK THE SHIP DIRECTLY INTO THE PATH OF A
HURRICANE.

The summary judgment standard:

The federal summary judgment standard was articulated by the Supreme Court in

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).  Under *Celotex,* a party seeking summary

judgment has the initial responsibility to identify documents in the record that it contends

demonstrate the absence of a genuine issue of material fact.  Regardless of whether the

motion is accompanied by supporting affidavits, it should be granted "so long as

whatever is before the district court demonstrates that the standard for entry of summary

judgment, as set forth in Rule 56(c), is satisfied."  *Id.* at 323.[3]

The clear evidence of conduct that was negligent, if not reckless:

As noted above, the ship's captain, with the knowledge and consent of the

Shipowners, planned to and did sail directly into the path of a storm that became a

hurricane shortly after the *El Faro* left port, ignoring numerous opportunities to change

course and avoid the storm.  This decision was negligent last century *compare Texas &*

---

[3] While *Celotex* does contemplate the motion for summary judgment being made "after
adequate time for discovery," (477 U.S. at 322), the factual setting of this case reveals
that all relevant information is within the knowledge or control of the Shipowners.  The
remains of the ship are at the bottom of the ocean, and Claimants have no information
relevant to this limitation action that is not already public knowledge.

*Gulf S.S. Co. v. Parker*, 263 F. 864, 867 (5th Cir. 1920) ("[T]he master was negligent in the attempt to outrun a hurricane with a small vessel, not adapted to weather it, if encountered, and when the chances of encountering it, based upon the available information, were preponderating."), and the decision to intentionally travel towards a hurricane is unfathomable in the present day. *See generally DiMillo v. Sheepscot Pilots, Inc.*, 870 F.2d 746, 748 (1st Cir. 1989) ("The appropriate standard of care was obviously transgressed here. [The Captain] departed port in utter disregard of an aposematic[4] forecast, and then stayed overlong in worsening seas before turning back. In our view, this was negligence of a rather egregious sort.").

The Fifth Circuit's decision in *Texas & Gulf S.S. Co. v. Parker* strongly supports the Claimants' assertion that the Shipowners and their captain were negligent in sailing into the teeth of a hurricane. In *Parker,* the *Pilot Boy,* a freight-carrying vessel, foundered and lost all of her cargo when she left port after her master either received or had access to warning of an approaching hurricane. (263 F. at 864) The Shipowner filed a petition for limitation of liability under the Limitation Act, asserting that the ship's master was not negligent. The claimants, whose property had been lost, prevailed in the district court, which found that the shipowner was not entitled to limitation of liability, and the Fifth Circuit affirmed. The first issue addressed by the Court of Appeals was whether the captain was negligent in leaving port and traveling into an approaching hurricane. In language that could have been written about the actions of the *El Faro* in this case, the Fifth Circuit held:

---

[4]  An "aposematic" forecast is one that warns of danger. *See Merriam Webster Dictionary* which defines "aposematic" as "conspicuous and serving to warn."

11

We think the master either had information that the hurricane was entering the Gulf [and would be approaching the ship's intended path] or that information of that character was available in Galveston before the departure of the *Pilot Boy* upon proper inquiry, which the master failed to make. *In either case the master was negligent in the attempt to outrun a hurricane with a small vessel, not adapted to weather it, if encountered, and when the chances of encountering it, based upon the available information, were preponderating.*

*Id.* at 867 (emphasis added).

In this case, the *El Faro* left port in Jacksonville with the plan of outrunning an approaching hurricane by sailing towards the storm. This was not a reasonable hurricane preparation plan. *Fischer v. S/Y NERAIDA*, 508 F.3d 586, 594 (11th Cir. 2007) ("Applied to the context of hurricane preparations, reasonable care amounts to whether the owner 'use[d] all reasonable means and took proper action to guard against, prevent or mitigate the dangers posed by the hurricane.'").

The record in this case establishes the same negligent failures to act safely in the face of a storm as were found negligent in these cases.

1.      Planning a voyage that would take the ship close to a dangerous storm;

2.      Sailing the vessel directly into the storm; and

3.      Ignoring multiple opportunities to avoid the storm.

Therefore, the Claimants have met their burden in the limitation action to prove liability, and this limitation action must fail unless the Shipowners can prove lack of knowledge and privity.

II

THE SHIPOWNERS' DIRECT INVOLVEMENT IN THE
PLANNING AND EXECUTION OF THE VOYAGE
AND THEIR REAL-TIME ACTUAL OR
CONSTRUCTIVE KNOWLEDGE OF THE SHIP'S
COURSE AND LOCATIONS CONCLUSIVELY SHOW
THAT THE SHIPOWNERS CANNOT MEET THEIR
BURDEN OF SHOWING LACK OF KNOWLEDGE
AND PRIVITY.

The legal definition of knowledge and privity:

In *Hercules Container, Inc. v. Claimant St. of Fla. Dept. of Transportation,* 768
F.2d 1558 (11th Cir. 1985) and *American Dredging Co. v. Lambert,* 81 F.3d 127 (11th
Cir. 1996) the Eleventh Circuit thoroughly discussed the meaning of "knowledge and
privity" as that phrase is used in the Limitation Act. *Hercules Container,* at 1574.
*Lambert,* quoting *Hercules,* makes it clear that a shipowner must negate both actual *and*
constructive knowledge in order to prevail in a limitation proceeding:

> Thus, while knowledge may stem from an owner's personal
> participation in the negligence, *see Petition of M/V
> Sunshine, II,* 808 F.2d 762, 763 (11th Cir. 1987), it also
> may exist where the owner *"could have and should have
> obtained the information by reasonable inquiry or
> inspection," Hercules,* 768 F.2d at 1577. (Emphasis added;
> footnote omitted.)

81 F.3d at 130.  The persons whose knowledge is relevant include the managing agents,
officers, and supervisory employees of the shipowner.  (*Id.*)  In this case, the Shipowners'
managers had actual knowledge of the captain's plan to sail toward the storm.  Once the
ship was under way, in the words of *Lambert* and *Hercules,* the managers of the
Shipowners had constructive knowledge of the ship's disastrous course, because they
"could have" and "should have" been aware that the captain was sailing the *El Faro*

directly toward Hurricane Joaquin. Therefore, the Shipowners will be unable to carry their burden of proving lack of knowledge and privity if they had the means to know of the ship's dangerous course.

The undisputed material facts showing the Shipowners' knowledge and privity:

Claimants have filed two expert affidavits and the transcript of admissions of the Shipowners' top managers that demonstrate the following acts of negligence on the part of the *El Faro's* captain, performed with the knowledge and approval of the Shipowners, as well as the negligence of the Shipowners themselves:

> 1. The *El Faro* left port with a plan to sail toward a tropical storm projected to become a hurricane;
>
> 2. The Shipowners' management was aware of and approved the plan;
>
> 3. After leaving port the captain followed the plan by steering the ship straight toward the storm;
>
> 4. The Shipowners' management had knowledge of the ship's potentially disastrous course and the right and the ability to overrule the captain's reckless decision to sail toward a hurricane but failed to do so;
>
> 5. The captain and the Shipowners missed or ignored multiple opportunities to avoid the storm; and
>
> 6. Management had the ability to follow the ship's course and the storm's path at all material times by using publicly available information on the internet.

Given this evidence, the Shipowners will be unable to prove lack of knowledge and privity, and the Shipowners' limitation action must fail.

III

THE SHIPOWNERS' KNOWLEDGE RENDERS LIMITATION OF LIABILITY IMPOSSIBLE AND ENTITLES CLAIMANTS TO PROCEED WITH THEIR JONES ACT AND DEATH ON THE HIGH SEAS CLAIMS IN STATE COURT WITHOUT LITIGATING THE ISSUE OF NEGLIGENCE AND UNSEAWORTHINESS IN THIS NON-JURY ADMIRALTY ACTION.

The federal courts have long recognized that there is some tension between the Limitation Act, which allows shipowners to seek limitation of liability in non-jury admiralty proceedings in federal court and the saving to suitors clause, which preserves claimants' right to jury trial where, as in this Jones Act case, there is such a right. The Supreme Court's most recent consideration of the Limitation Act and its relationship with the saving to suitors clause is found in *Lewis v. Lewis & Clark Marine, Inc.,* 531 U.S. 438 (2001). In that case the claimant sued the shipowner in state court but did not demand a jury trial. Anticipating the suit, the shipowner had already filed an action for exoneration from, or limitation of, liability under the Limitation Act and the admiralty rules. In that action the federal district court initially enjoined the prosecution of the state court suit. The claimant then moved to dissolve the injunction, stating that he was the only claimant and stipulating that if he was able to prevail in state court, the shipowner could relitigate the issue of liability in the limitation action. The district court dissolved the injunction, retaining jurisdiction over the limitation action to protect the shipowner's right to limitation at the conclusion of the state court proceeding. *In re Lewis & Clark Marine, Inc.,* 31 F. Supp.2d 1164 (E.D. Mo. 1998). However, the Eighth Circuit reversed the district court, holding that the Shipowners were entitled to seek exoneration in federal

court.  The court of appeals found that there was no conflict between the saving to suitors clause and the Limitation Action in the case before it, because the claimant had not requested a jury trial in state court.  *In re Lewis & Clark Marine, Inc. v. Lewis,* 196 F. 3d 900 (8th Cir. 1999).

The Supreme Court, in an opinion authored by Justice O'Connor, unanimously reversed the Eighth Circuit's decision, holding that, because the stipulation adequately protected the shipowner's right to limitation, the claimant had a right under the saving to suitors clause to proceed in state court.  In an extensive review of the Court's decisions construing the clause, the opinion quoted the following portion of the Court's decision in *Red Cross Line v. Atlantic Fruit Co.,* 264 U.S. 109, 123-124 (1924) to explain the relationship between admiralty law and the saving to suitors clause:

> . . . [the "saved rights" include] *all means other than proceedings in admiralty which may be employed to enforce the right or to redress the injury involved.*  It includes remedies *in pais,* as well as proceedings in court; judicial remedies conferred by statute, as well as those existing at the common law; remedies in equity, as well as those enforceable in a court of law." (Emphasis added; citation omitted.)

531 U.S. at 445.

The Court then considered the interplay between the saving to suitors clause and the Limitation Act.  It emphasized that federal admiralty jurisdiction should only be exercised to the extent necessary to limit shipowners' exposure to liability in situations where they can prove that they lack privity or knowledge:

> By its own terms, the Limitation Act protects the right of vessel owners to limit their liability to the value of the vessel, *provided that the events or circumstances giving*

*rise to the damage occurred without the vessel owner's privity or knowledge*.  The Act was designed to encourage investment and protect vessel owners from unlimited exposure to liability.  *We have also made clear, however, that the scope of exclusive federal jurisdiction is proportional to the federal interest in protecting the vessel owner's right to seek limitation of liability.  See Lake Tankers,* 354 U.S. at 153.  We have explained that "[t]he Act is not one of immunity from liability but of limitation of it."  *Id.* at 152.  We see no reason to revisit that conclusion and decline respondent's invitation to expand the scope of the Act.

531 U.S. at 453(emphasis added).

The Court then applied this view of limited federal jurisdiction to the shipowner's ability to obtain complete exoneration from the injured person's claim, making it clear that the right to seek exoneration is ancillary to, and dependent on, the right to obtain limitation of liability.  The Court held that "The [Limitation] Act and the rules of practice, however, *do not create a freestanding right to exoneration from liability in circumstances where limitation of liability is not an issue.*"  (Emphasis added.) (*Id.*)  The Court then reversed the Eighth Circuit's decision and reinstated the district court's order dissolving the injunction against state court proceedings, because the claimant's stipulations had adequately protected the shipowner's right to seek limitation at the conclusion of the case in state court.

Under *Lewis,* then, the federal courts only exercise their admiralty jurisdiction to the extent necessary to protect the right to limitation.  Therefore the need for this Court's involvement would also cease to exist if it is clear, under the circumstances of this case, the Shipowners cannot carry their burden of proving lack of knowledge and privity.

This conclusion is also supported by *Fecht v. Makowski,* 406 F.2d 721 (5th Cir. 1969), where the Fifth Circuit Court of Appeals reversed a district court's order exonerating a boat owner from liability on the ground that under the facts of the case it would be impossible for the boat owner to prevail on limitation of liability.[5]  Noting that the boatowner, who was also operating the boat when the accident occurred, would never be able to disprove knowledge and privity of his own negligence, if any, the Fifth Circuit held:

> Where no grant of limitation is possible, the basis for granting exoneration vanishes.  In such a case, a boat owner should not be treated more favorably than an automobile driver.  The latter is not entitled to force a damage claimant to a trial without a jury.  Neither should the former.

406 F.2d at 723.  On the basis of this reasoning, the Fifth Circuit reversed the judgment of exoneration, holding that it was error for the district court even to consider the petition for exoneration where it was impossible for the owner and operator of the boat to deny knowledge and privity of his own negligence.  (*Id.*)

*Fecht* was later held inapplicable to a case where the trial judge had granted a motion to dismiss a limitation action on knowledge and privity grounds, but that case, *In re Petition of MV Sunshine,* 808 F.2d 762 (11th Cir. 1987), simply stands for the principle that final determination of the knowledge and privity question was premature on a motion to dismiss.  The Eleventh Circuit did not, however, recede from *Fecht's* basic

---

[5]  As a Fifth Circuit case predating the creation of the Eleventh Circuit, *Fecht is* binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981).

principle—that (as Justice O'Connor would later write in *Lewis*) there is no "freestanding" right to exoneration.

If there was any doubt about the continuing vitality of *Fecht* in the Eleventh Circuit after *MV Sunshine,* that doubt was laid to rest in *Suzuki of Orange Park, Inc. v. Shubert,* 86 F.3d 1060 (11th Cir. 1996), where the district court had dismissed the vessel owner's limitation action on the authority of *Fecht*.  The court of appeals reversed the dismissal, but only because it felt that there were still issues as to whether the owner would be entitled to limitation.  It is clear from the opinion that the court agreed that the normal two-step analysis in limitation actions, where the claimant first had to prove negligence or unseaworthiness, would not apply where under no circumstances could the owner establish lack of privity or knowledge.  The *Shubert* court wrote*:*

> Thus, *Fecht* establishes that the admiralty court may decide the privity or knowledge issue without first deciding the liability issue-at least where the boat owner concedes privity or knowledge, *or where it is otherwise impossible under any set of circumstances for the vessel owner to demonstrate the absence of privity or knowledge.  See also Joyce v. Joyce,* 975 F.2d 379, 385 (7th Cir. 1992) (where sole allegation against boat owner is negligently entrusting the boat to its operator, the boat owner is necessarily ineligible for limited liability because privity or knowledge is an element of the tort of negligent entrustment). (Emphasis added.)

(86 F.3d at 1064).

This is another case where, as in *Fecht* and *Joyce,* there are no conceivable circumstances under which the Shipowners can prove lack of privity and knowledge.  To the extent to which the negligence alleged involves the voyage planning, it is clear that the Shipowners had actual knowledge, according to their statements at the news

19

conference.  They also had imputed knowledge of everything the captain knew before the ship left port, which would obviously include the trip planning.  After the *El Faro* left port its course and positions and the hurricane's track were readily ascertainable from publicly available information.[6]  It will be impossible for the Shipowners to prove lack of knowledge and privity of the ship's dangerous course.

It will be similarly impossible for the Shipowners to prove lack of knowledge and privity with respect to the Claimants' allegations of unseaworthiness not, as in the case of negligent navigation, because of modern technology, but because of a settled legal principle—that a shipowner has constructive knowledge of any defect in the vessel that exists at the start of the voyage and cannot obtain limitation of liability on that basis.  The Eleventh Circuit so held in *Villers Seafood, Inc. v. Vest,* 813 F.2d 339 (11th Cir. 1987), following its earlier decision in in:

> A shipowner may not limit his liability under the limitation act if his ship is unseaworthy due to equipment which was defective at the start of the voyage.  He is charged with knowledge of the existence of that condition.  *Hercules Carriers, Inc. v. Florida,* 768 F.2d 1558, 1563 (11th Cir. 1985).

The Claimants' allegations of unseaworthiness involve defects in the *El Faro* in existence at the outset of the voyage and even if they did not, it is now obvious that no other defects

---

[6]  Indeed, in this day of the internet, tracking satellites, and the lightning-fast transmission of data about both ships and the weather, as well as the owner's ability to communicate with the ship by radio and cell phone, it should be virtually impossible for a shipowner to prove lack of privity and knowledge in a case where the basic claim is that the captain took an unreasonable dangerous course.

will be probable, since the ship rests on the bottom of the ocean and there are no surviving crew members.

*Fecht* does apply in this case, because limitation is impossible due to the Shipowners' actual, imputed, and constructive knowledge and privity. Claimants should be allowed to pursue the remedies guaranteed by the saving to suitors clause.

CONCLUSION

Claimants' motion for summary judgment should be granted and the injunction against Claimants proceeding in their previously-filed cases should be dissolved.

Respectfully submitted,

**PAJCIC & PAJCIC, P.A.**

*/s/ Stephen J. Pajcic, III*
_____
**STEPHEN J. PAJCIC, III**
Florida Bar No.: 143485

*/s/ William A. Bald*
_____
**WILLIAM A. BALD**
Florida Bar Number 167466

*/s/ Benjamin E. Richard*
_____
**BENJAMIN E. RICHARD**
Florida Bar No. 13896

**THOMAS F. SLATER**
Florida Bar No.: 614114
**MICHAEL S. PAJCIC**
Florida Bar No.: 56664
One Independent Drive, Ste. 1900
Jacksonville, FL 32202
Telephone:      (904) 358-8881
Telefax:          (904) 354-1180
Tom@pajcic.com; Mpajcic@pajcic.com;

Ben@pajcic.com
*Attorneys for Defendants/Claimants Tracey Hatch, as Personal Representative of the Estate of Carey Hatch, deceased and Tina Riehm, as Personal Representative of the Estate of Jeremie H. Riehm, deceased*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished to all counsel of record via the EM/ECF system this 14th day of December, 2015.

*/s/ Stephen J. Pajcic, III*
_____
**STEPHEN J. PAJCIC, III**
Florida Bar No.: 143485
**THOMAS F. SLATER**
Florida Bar No.: 614114
**BENJAMIN E. RICHARD**
Florida Bar No. 13896
**MICHAEL S. PAJCIC**
Florida Bar No.: 56664
**WILLIAM A. BALD**
Florida Bar Number 167466
One Independent Drive, Ste. 1900
Jacksonville, FL 32202
Telephone:     (904) 358-8881
Telefax:        (904) 354-1180
Tom@pajcic.com; Mpajcic@pajcic.com;
Ben@pajcic.com
*Attorneys for Defendants/Claimants Tracey Hatch, as Personal Representative of the Estate of Carey Hatch, deceased and Tina Riehm, as Personal Representative of the Estate of Jeremie H. Riehm, deceased*

22